IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2001

## STATE OF TENNESSEE v. KENNETH PAUL DYKAS

**Appeal from the Circuit Court for Rutherford County
No. F-44931A     J. Steve Daniel, Judge**

---

**No. M2000-01665-CCA-R3-CD  - Filed March 5, 2002**

---

After a lengthy trial, a Rutherford County jury found the defendant, Kenneth Paul Dykas, guilty of first-degree murder, especially aggravated robbery, and conspiracy to commit especially aggravated robbery.  Following a separate penalty trial on the first-degree murder conviction, the same jury sentenced the defendant to life without the possibility of parole, and the trial court subsequently sentenced the defendant as a Range I offender to eleven years on the conspiracy conviction and as a violent offender to 24 years on the especially aggravated robbery conviction.  The trial-court-imposed sentences were ordered to run concurrently with one another but consecutively to the first-degree murder sentence.  In this appeal, the defendant complains that the evidence is insufficient, that numerous errors in the jury selection process taint his convictions, that DNA test results were improperly admitted, that the state suppressed exculpatory evidence about its jailhouse informant who testified at trial, and that consecutive sentencing was not justified.  After a comprehensive review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

L. Gilbert Anglin and David Bragg, Murfreesboro, Tennessee, for the appellant, Kenneth Paul Dykas.

Paul G. Summers, Attorney General and Reporter; Jennifer Smith, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; Thomas F. Jackson, Jr., Assistant District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Between 5:00 p.m. and 5:30 p.m. on February 20, 1998, Donald Roscoe Greenwood was bludgeoned to death with a claw hammer in Room 178 at the Jackson Motel in Murfreesboro, Tennessee. Mr. Greenwood, who was 69 years old and suffered from Parkinson's Disease, had moved a short time before to Murfreesboro and rented a room at the motel to be closer to the Veterans' hospital where he was being treated.

From the vantage point most favorable to the state, the evidence at trial demonstrated that the defendant and his girlfriend, Deborah Reese, had taken up residence in Room 184 at the same motel a month earlier. Their financial situation was bleak. She was working at a Hardee's restaurant across the street from the motel, and for about a year, the defendant had not held a steady job. The Jackson Motel manager testified at trial that the couple was behind in their rent payments at the time of the victim's death.

The defendant and Reese befriended the victim the same day that the victim settled into the motel room. On February 19, the following day, the victim went to the motel office to submit a list of things that needed to be fixed or cleaned in his room. The defendant offered to the motel manager to help clean Mr. Greenwood's room. The motel manager, Nancy Robinson, testified at trial that she also recalled the defendant telling her that he and Reese would "look after the old man" and take some of the burden off of her. Ms. Robinson became suspicious of the couple as soon as they made friends with the victim.

As the day progressed, the defendant ingratiated himself further with the victim by volunteering to drive him to Wal-Mart the next day. The victim accepted the offer. As part of their investigation, Murfreesboro Police Department officers were able to construct a time line tracking the activities of the defendant, Reese, and the victim on February 20, the day of the murder. Based on receipts and numerous interviews with local merchants, the officers determined that the victim purchased household-type items totaling $161.47 at Wal-Mart at approximately 12:30 p.m. At 1:50 p.m. the victim and a woman, who was later identified as Reese from a photo spread, purchased beer, liquor, cigarettes, and deli food at a local market/package store. The victim paid for the items in cash.

The next time that the couple and the victim were spotted together was after 2:00 p.m. when Eddie Tennyson, the motel maintenance supervisor, went to the victim's apartment to retrieve a cordless drill that had been borrowed earlier that day. Tennyson testified that the defendant was putting up a cabinet for the victim and that Reese and the victim also were present. Around 4:00 p.m., Valerie Moore placed a call to the victim's apartment. Ms. Moore, who was a friend of the victim, testified that a man answered and handed the telephone to the victim. The victim explained to her that the person who answered the phone was helping him with things in the apartment that needed to be done.

The last outside contact with the victim was at approximately 5:00 p.m. when his former wife, Shirley Barrett, called. Ms. Barrett testified that she and the victim talked for roughly ten minutes, and during the conversation Ms. Barrett heard male and female voices in the background. Ms. Barrett stated that the victim told her that "Debbie and Ken," who lived in apartment 184, were hanging up shelves for him that he had purchased at Wal-Mart.

Alice Lovvorn was working the 3:00 p.m. to 11 p.m. shift at the Jackson Motel on February 20. At approximately 9:00 p.m. she saw Reese peeping through the venetian blinds into the victim's room. According to Lovvorn, the defendant then walked up, banged on the victim's door, and tried to open it. When he was unsuccessful, the defendant walked to the office, and Lovvorn handed him the keys to the victim's apartment. Lovvorn testified that she saw Reese and the defendant go inside the apartment, after which Lovvorn heard a scream. Lovvorn called the police, and she told the couple to come out of the room and not to touch anything.

Officers with the Murfreesboro Police Department responded to the call, and agents with the Tennessee Bureau of Investigation were summoned to process the crime scene. Crime scene photographs and a videotape were introduced at trial. Significant amounts of blood and blood spatter were discovered throughout the room, including on the bathroom sink, the top of the microwave, the front of the refrigerator, and on the ceiling directly above the victim's body. A claw hammer with a large amount of blood staining was found underneath a table in the room. The victim's body was on the floor next to the bed.

Detective Joel Davis was one of the Murfreesboro police officers who responded to the homicide call. He was directed to interview the defendant and Reese because evidently they were the last people who had been with the victim. Detective Davis conducted the interview in the couple's room. Detective Davis testified that he became concerned by their "lackadaisical" attitude. The couple was unable to provide general information about when and where they had been that day. The defendant inquired at one point whether he was going to jail; similarly, Reese also wanted to know if she was going to be arrested.

The police sought and obtained consent from the couple to search their room and vehicle. The police also decided that the defendant and Reese should be questioned at the police station. At the police station, the couple answered questions, gave permission to have their blood drawn, and allowed their clothing to be examined for the presence of blood by black light and luminol testing. No blood was detected on the clothing.

TBI Agents Steve Scott, Oakley McKinney, and Joe Minor testified at trial about the crime scene investigation. After the victim's apartment was processed for evidence, the agents searched and examined the defendant's apartment. They were particularly interested in looking for items that might be bloodstained. The agents found and collected bloodstains on the doorjamb of the defendant's apartment, on the concrete ground directly outside his apartment, and on a pair of boots underneath the bed.

Agent McKinney subsequently examined various items of evidence for the presence of latent fingerprints. He testified that he was unsuccessful in getting prints from the suspected murder weapon, the hammer. Likewise, Agent McKinney tried but was unable to lift any prints from the victim's wallet, its contents, or his briefcase. Latent prints, however, were developed from a Kessler liquor bottle, a coffee can, and a magazine found in the victim's apartment. The defendant's prints were on the bottle and magazine, and Reese's prints appeared on the coffee can.

TBI Agent Connie Howard, a forensic scientist specializing in DNA analysis, testified about the bloodstains that she tested. The bloodstain sample collected from the door frame of the defendant's apartment matched that of the victim. The bloodstain on the concrete in front of the defendant's apartment matched the defendant's blood. One bloodstain sample taken from the defendant's work boots was tested and found to match that of the victim.

The most detailed testimony at trial was provided by Reese. On February 23, 1999, Reese pleaded guilty to first-degree murder, especially aggravated robbery, and conspiracy. For the murder, she received a life sentence; for the especially aggravated robbery, fifteen years; for the conspiracy, eight years. All sentences were ordered to run concurrently.

Reese corroborated the earlier proof of the places and times that she, the defendant, and the victim were together on the day of the murder. Reese testified that throughout the afternoon, the three of them were drinking. She and the defendant went back and forth several times between their apartment and the victim's apartment. Reese remembered being in the victim's room when Moore called about 4:00 p.m. and when Barrett later called about 5:00 p.m.

Reese recounted for the jury the events leading up to the murder. She testified, "We were sitting around the table. It was a round table. And I figured, you know, we'd just get him drunk and maybe take his money. But that didn't happen that way. It just went bad." According to Reese, the defendant suddenly struck the victim in the head with the hammer that had been used to hang up the cabinet. The victim fell off his chair and landed partially on the bed. The victim implored them, "[Y]'all don't have to do this." The defendant wanted to know if the victim had a pulse to determine if he was alive. Reese checked and told the defendant that she detected a pulse, whereupon the defendant proceeded to strike the victim repeatedly until he had no pulse. Reese testified that the defendant then told her to get the victim's wallet, which she did, and she removed $370.

Reese testified that she and the defendant returned to their apartment, cleaned up, changed clothes, and again started drinking. About 7:45 p.m. they took $70 of the victim's money, drove to Food Max, and made additional purchases. Along the way, they threw the soiled clothing in a dumpster. When they returned to their apartment, Reese began cooking, and she made up a plate of food to take to the victim so that they would have an excuse to find the victim's body. Reese testified about finding the door to the victim's apartment locked and summoning help.

-4-

Dr. Charles Harlan performed the autopsy on the victim's body. He testified that the cause of death was blunt trauma to the head. The victim had sustained multiple fractures to his skull. The victim's left ear was injured, and his right eye was basically destroyed. There were numerous other injuries to the victim's chest and neck that were consistent with a claw hammer. Dr. Harlan testified that he also found numerous broken ribs on the anterior and posterior portion of the victim's body.

The final key pieces of evidence that the state introduced were letters that the defendant had written to Reese while he was incarcerated and awaiting trial and inculpatory confidences that the defendant had shared with cellmate, Steve Riggan. While the defendant's letters did not contain express admissions of guilt, in the light most favorable to the state, they reflected appeals by the defendant for Reese to "hang tough," to remember "no deals," and not to hurt him or let him down. In the letters, the defendant also repeatedly professed his love and devotion and his intention that he and Reese be married.

Steve Riggan testified that for approximately three weeks in May and June of 1998, he shared a cell with the defendant, who was awaiting trial. Riggan was being held for a probation violation. At first, the defendant talked with Riggan about how the defendant came to be arrested. Riggan testified that initially the defendant denied knowing what happened, but then the defendant would talk about how Reese actually murdered the victim. Riggan testified that finally the defendant admitted that he "in fact had killed the man and that he was the one that put the hammer on Mr. Greenwood." The state elicited from Riggan the detailed account of the murder provided by the defendant to Riggan. After Riggan was released in June, he decided that the "right thing to do" was tell the police. Riggan wrote a letter to the police and subsequently provided a videotaped statement to Detective Guthrie.

At the conclusion of the state's case-in-chief, the defense rested without presenting proof.

The jury found the defendant guilty of premeditated first-degree murder, felony murder, especially aggravated robbery, and conspiracy to commit especially aggravated robbery. The convicting jury also heard evidence and deliberated on the defendant's punishment for committing first-degree murder. The jury sentenced the defendant to life without the possibility of parole based on the aggravating factors (a) that the murder was especially heinous, atrocious, and cruel, (b) that the murder was committed to avoid or prevent the arrest or prosecution of the defendant, and (c) that the victim was killed in the commission of a robbery in which the defendant played a substantial role. *See* Tenn. Code Ann. § 39-13-204(i)(5), (6), (7) (Supp. 2001). At a separate sentencing hearing, the trial court then sentenced the defendant as a Range I offender to eleven years on the conspiracy conviction and as a violent offender to 24 years on the especially aggravated robbery conviction; those two sentences were ordered to be served concurrently to each other but consecutively to the life without parole sentence.

This appeal ensued.

## I. Sufficiency of the Evidence[1][2]

The defendant complains that the evidence is insufficient to support the jury's verdict that he engaged in a "conspiracy" to commit especially aggravated robbery. He also maintains that his conviction for premeditated, first-degree murder is based on legally insufficient evidence and, therefore, must be reversed. We are unpersuaded that the evidence supporting these convictions is legally infirm.

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational factfinder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

The defendant in this case was charged in separate counts with premeditated, first-degree murder and felony murder. The jury found the defendant guilty on both counts, and the trial court correctly accepted both verdicts but then merged them into a single conviction for first-degree murder. *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). When the merger occurs, proof of either felony murder or premeditated murder is sufficient to sustain the conviction. *See State v. Patrick Wingate*, No.

---

[1] Our discussion of the issues in this opinion is in a different order than their presentation in the parties' briefs.

[2] Citations and page references to the record are conspicuously absent from the argument section of the defendant's brief. The rules of this court warn counsel that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Despite the defendant's waiver, we have decided to address the issues raised on appeal so that this appeal might be disposed of in an expeditious manner and brought to a proper conclusion. Tenn. R. App. P. 2. Counsel should be mindful that dwindling judicial resources increasingly curb the court's ability to relieve litigants of the consequences of noncompliance with the rules.

M1999-00624-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, May 25, 2000), *perm. app. denied* (Tenn. 2000). The defendant in this case, consequently, cannot profit on his evidence insufficiency claim unless the proof of both felony murder *and* premeditated murder is lacking. Such is not the case.

The elements of premeditated, first-degree murder are a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (Supp. 2001). The defendant isolates portions of the testimony of Reese and Riggan, which the defendant claims proves that the killing was a spontaneous reaction. The evidence in this case, however, viewed most favorably to the state clearly supports the jury's conclusion that the killing was premeditated.

The element of premeditation is a jury question and may be established by proof of the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992). Several factors are regarded as relevant to the existence of premeditation, including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. Most of these factors appear in this case. The defendant wielded a claw hammer, a deadly weapon, upon an elderly, infirm, and unarmed victim. The killing was particularly cruel with the victim begging that "y'all don't have to do this." Then after the murder, the defendant calmly washed his hands and the hammer in the victim's bathroom, and he and Reese carefully orchestrated a coverup so they could pretend to discover the body. Perhaps most telling was the defendant's instruction to Reese to check the victim's pulse to see if he was still alive; when she reported that the victim had a pulse, the defendant resumed striking the victim until he was dead. From these circumstances, the jury reasonably could conclude beyond a reasonable doubt that the defendant premeditated the murder.

The defendant has not assailed the sufficiency of the evidence as it relates to the felony murder guilty verdict, and we detect no basis to do so. The jury was entitled to credit Reese's testimony that after the vicious and lethal assault, they stole $370 in cash from the victim's wallet. Also, Steven Riggan testified that the defendant had confided stealing money from the victim's wallet in connection with the murder.

Finding no insufficiency with the evidence presented at trial, we affirm the defendant's conviction for first-degree murder.

The defendant's argument that the record is barren of evidence that he conspired with Reese is, likewise, unavailing. A conviction for conspiracy to commit especially aggravated robbery requires evidence that

> two (2) or more people, each having the culpable mental state
> required for the offense which is the object of the conspiracy and each
> acting for the purpose of promoting or facilitating commission of an

offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a) (1997). An additional element for the offense of conspiracy is that "an overt act in pursuance of such conspiracy [must be] alleged and proved to have been done by the person or by another with whom the person conspired." *Id*. § 39-12-103(d).

The primordial feature of the crime of conspiracy is the accord – the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992) ("a mutual[ly] implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

We think that a rational jury could easily reach the conclusion, as it did in this case, that the defendant was acting pursuant to a tacit agreement between himself and Reese. The proof, for instance, showed that Reese and the defendant had lived together for approximately a year. Reese and the defendant were financially insecure; stated otherwise, they "didn't have two pennies to rub together." Both of them drove and escorted the victim on the shopping expedition. Reese testified at trial that she and the defendant "acted as a team" and that she and the defendant had discussed beforehand taking the victim's money. While Reese maintained that she "really didn't know" that the defendant was going to kill the victim, she did believe that the defendant "might just knock him out or something." Reese then later assisted the defendant in staging their discovery of the victim's body. Finally, in the letters sent by the defendant to Reese, he spoke repeatedly of "sticking" together and of the police trying to "set" them up; he also implored Reese to marry him as soon as feasible.

The jury's conclusion that the defendant and Reese were co-conspirators is eminently reasonable and amply supported by the evidence.

## II. Jury Selection

By far, the largest flock of issues that the defendant presents for review relates to claimed irregularities in the jury selection process. His complaints relate to juror bias, lack of notice as to which method of selection would be used for the alternates, communications between a court officer and a juror, re-opening voir dire of jurors, and disallowance of a peremptory challenge after voir dire was re-opened. To place these issues in context, we briefly recount what happened during jury selection.

After questioning by the trial court and the parties, a regular, twelve-member jury panel was selected. Thereafter, the trial court tentatively seated four potential alternate jurors. One of the four was Carol Pierce. During earlier questioning, Ms. Pierce disclosed that her daughter had been a recent crime victim, but Ms. Pierce gave assurances that she could decide the defendant's case on its merits. Ms. Pierce occupied alternate position two, but after the defendant peremptorily challenged the alternate juror in position one, Ms. Pierce advanced to position one. On the next round of challenges, the defendant tried to challenge Ms. Pierce, but the trial court disallowed the challenge based on Criminal Procedure Rule 24(e)(1). *See* Tenn. R. Crim. P. 24(e)(1). Another alternate juror was seated, and the unsworn jury retired for a break.

During the break, another juror, Mr. Parrish, approached a court officer and expressed reservations about deciding the case based upon religious grounds. The court officer reported the information to the trial court, whereupon Mr. Parrish was brought into the courtroom and questioned by the trial court and the parties. Based on the questioning, the trial court excused Mr. Parrish for cause and replaced him with Ms. Pierce, who had been seated as alternate juror one. The defendant tried again to challenge Ms. Pierce, this time for cause, but the trial court denied the challenge based on Ms. Pierce's indications that she could be fair and impartial.

In denying the defendant's motion for new trial, the trial court in this case issued comprehensive written findings regarding jury selection. Our review has been substantially facilitated by these findings. In its order, the trial court admitted that it neglected to advise the parties beforehand as to which method of alternate juror selection would be used but that by soliciting challenges to alternate juror one, the trial court clearly signaled that it was following the Rule 24(e)(1) procedure. The trial court further explained that it found no basis to remove Ms. Pierce for cause, given her assurances. As for Mr. Parrish, the trial court believed that he would not be capable sitting as a juror because of his religious beliefs, and the only way to inquire about his reservations once he discussed them with the court officer was to re-open voir dire.

A trial court's method of conducting jury voir dire in a criminal case must comport with constitutional due process notions of fundamental fairness. *See Mu'Min v. Virginia*, 500 U.S. 415, 426, 111 S. Ct. 1899, 1905 (1991). Jurors "may sit on a case, even if they have formed an opinion on the merits of the case, if they are able to set that opinion aside and render a verdict based upon the evidence presented in court." *State v. Mann*, 959 S.W.2d 503, 531 (Tenn. 1997). In many instances, the prospective juror's acceptability will depend on the believability of the avowal as to impartiality. *See* Tenn. R. Crim. P. 24(b)(2). Indeed, in light of the trial judge's opportunity to hear and observe the prospective jurors, courts have deferred to the trial judge to determine the ability of a prospective juror to impartially hear the case. *Mu'Min*, 500 U.S. at 427, 111 S.Ct. at 1906. Given this deference, a "trial court's findings of juror impartiality may be overturned only for 'manifest error.'" *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889 (1984)). There is no such error in this record.

The defendant couches one of his grievances in terms of the trial court's failure to question the jurors about any involvement in crimes similar to those charged in the defendant's case.

Inasmuch as counsel for the parties were permitted to voir dire potential jurors and to question about potential bias, we are at a loss to appreciate how error infected the proceeding. As for Jurors Pierce and Parrish, the defendant offers little more than boilerplate objections, and he has not shown how or why the trial court abused its discretion.

Furthermore, we perceive no error or abuse of discretion related to Mr. Parrish's communications with a court officer or related to the additional questioning and removal of that juror. There is no proof that the court officer engaged the juror in conversation or solicited the juror's opinion about the case. Rather, the juror approached the court officer. Then once the information was brought to the trial court's attention, it was entirely appropriate for the trial court to inquire further of the juror. At that point, the decision to seat an alternate juror, when a regular juror must be removed, is left to the trial judge's discretion. Tenn. R. Crim. App. 24(e)(1). One challenging the trial court's decision to do so, as the defendant does in this case, has the burden of demonstrating prejudice by the seating of the alternate juror. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991); *State v. Max*, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986).

We are confident that had the juror in this case, for example, related to the court officer something unfavorable about the defendant, the defendant would be insisting that the court officer had a duty to promptly report it to the trial court, that the trial court should have immediately investigated, and that the juror should have been removed. The trial court, we conclude, acted appropriately when confronted with the situation in this case, and the defendant has shown us no prejudice from the removal of Juror Parrish or the seating of Juror Pierce.

The defendant's inability to demonstrate prejudice also disposes of his grievance that he was misled by the trial court's failure to notify him which method of selecting alternate jurors was being used and of his invocation of cumulative error. The trial court candidly admitted that the method of alternate juror selection was not specified beforehand; we agree, however, with the trial court that the way that jury selection proceeded, the defendant reasonably was on notice of the method. We note that the defendant on appeal does not specifically claim that he was misled; rather, his argument is more in the nature of asserting entitlement to additional peremptory challenges merely because the trial court failed to announce the method. We reject that assertion.

No relief premised on how jury selection was conducted in this case is required or warranted.

### III. Evidence of DNA Test Results

The defendant insists that the trial court committed reversible error in denying his motion to strike the results of DNA testing performed on blood stains found on a pair of work boots seized from the defendant. There was no proof, according to the defendant, establishing which of several blood stains on the boots was tested or the size and shape of the tested stain. As a result, the defendant argues that the jury was left to speculate about which stain was tested such that the jury was unfairly left with the impression that all of the blood on the boots came from the victim.

-10-

The defendant couches this issue solely in terms of evidence relevancy pursuant to Evidence Rule 403. That rule provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The defendant focuses on the "unfair prejudice" component of the rule, which he states includes those situations where a jury could misuse otherwise admissible proof. The defendant does not challenge the accuracy or reliability of the results of the DNA testing performed and does not question the qualifications of the expert witness who testified about the DNA test results.

Our review of this issue takes us into a familiar corner of the law. A trial court's decision to admit or exclude evidence based on its evidentiary relevance will not be disturbed absent an abuse of discretion. *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000); *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). The trial court's reason underlying its exercise of discretion in this case was that the defendant's motion to strike went to the weight, not the admissibility, of the evidence. The trial court explained,

> Clearly the lack of State proof identifying which of the blood stained areas on the boot was positive for that of the deceased's blood went to the weight of testimony of the T.B.I. expert and her credibility. This issue was fully explored by defense counsel in front of the jury and the jury had an opportunity to weigh that testimony and ascribe an appropriate weight to be given to this expert testimony. The Court finds this issue is without merit.

We agree with the trial court's assessment that weight, not admissibility, was the issue. The trial court properly admitted the evidence and correctly refused to later strike it. The jury then went about its appointed task of weighing the evidence and giving the test results whatever weight the jury believed appropriate in light of the defendant's countervailing arguments. Nothing in the record suggests that the trial court abused its discretion on this issue.

## IV. Suppression of Exculpatory Evidence

The defendant accuses the state of failing to advise him that Steve Riggan was a jailhouse informant who had given inculpatory information to the police involving another pretrial detainee. The pretrial detainee, Dondie Tidwell, had shared for a time a cell with Riggan and the defendant. Cellmate Tidwell was charged with murder, and his case was tried approximately seven months after the defendant was convicted. Riggan testified against Tidwell as a state witness. The defendant's attorney claimed that he learned of the connection between Riggan and Tidwell through newspaper coverage of the Tidwell trial, and the putative *Brady* violation was raised in the defendant's motion for new trial.

-11-

The trial court issued a written order overruling the defendant's new trial motion. The order, in pertinent part, recites,

> Mr. Riggan was incarcerated at a time in a cell with Mr. Dykas and obtained admissions from Mr. Dykas that he testified to during the trial. Riggan was also a cell mate of Dondie Tidwell and testified against him in a later trial in which Tidwell was charged with first degree murder. Apparently at some point in time Riggan identified himself to police authorities and initially testified against Mr. Dykas. Riggan then disclosed information against Mr. Tidwell and after the Dykas trial testified in that subsequent trial of <u>State v. Tidwell</u>. Mr. Dykas, in this assignment of error, asserts that the State failed to disclose that Riggan was testifying in the latter case and that this was exculpatory evidence which they failed to provide to the defendant. . . . The defendant has cited no authority that would lend itself to the conclusion that the fact that Mr. Riggan was anticipated to testify in the future against Mr. Tidwell meets the definition of exculpatory evidence required to be furnished by the State in <u>Brady v. Maryland</u>. Therefore, this assignment of error is overruled.

We begin by briefly reviewing the controlling constitutional principles. In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the United States Supreme Court held that the prosecution has a constitutional duty to furnish the accused with exculpatory evidence pertaining to either the accused's guilt or innocence and the punishment that may be imposed. Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. *Id*. at 87, 83 S. Ct. at 1196-97.

Decisions subsequent to *Brady* have established that to prove a due process violation, the defendant must show that the information was requested (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not), that the state suppressed the information, that the information was favorable to the accused, and that the information was material. *See State v. Edgin*, 902 S.W.2d 387, 389-90 (Tenn. 1995). The suppressed information is considered "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375 (1985). A "reasonable probability," the Supreme Court has explained, is a probability sufficient to "undermine[ ] confidence in the outcome of the trial." *Id*., 473 U.S. at 678, 105 S. Ct. at 3381.

In reviewing the trial court's ruling, it appears to us that the trial court misunderstood the defendant's complaint. In addition, from the trial court's statement that the information did not meet "the definition of exculpatory evidence," we cannot tell whether the trial court was referring to the requirement that the information be "favorable" or the requirement that the favorable

information be "material." Our independent review, however, convinces us that no due process violation occurred.

It may be that an extension of the defendant's complaint is that the state should have disclosed that Riggan would be testifying in a future case. The defendant, however, more specifically defined the issue in terms of the state withholding information that, prior to the defendant's trial, Riggan had given a videotaped statement to the same detectives involved in the defendant's case regarding inculpatory remarks made by another cellmate. Knowing that Riggan was informing on other cellmates would have, the defendant argues, served to impeach Riggan's credibility by contradicting Riggan's claimed motivation for testifying that "it's the right thing to do."

Impeachment evidence is treated no differently than other evidence in terms of exculpatory significance. "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 675, 105 S. Ct. at 3380. Impeachment evidence is "'evidence favorable to an accused,' . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.,* 105 S. Ct. at 3380. In this case, we cannot say that the information about Riggan is devoid of impeachment value; consequently, it qualifies as evidence "favorable" to the defendant. The next step is to determine if this favorable evidence is "material," such that its suppression violated due process.

The "materiality" of suppressed, favorable evidence was discussed at length in *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995). Four aspects are highlighted therein. First, establishing materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* at 434, 115 S. Ct. at 1566. Second, materiality "is not a sufficiency of evidence test." *Id.*, 115 S. Ct. at 1566. Third, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Id.* at 435, 115 S. Ct. at 1566. Last, the "suppressed evidence [is to be] considered collectively, not item by item" to gauge materiality. *Id.* at 436, 115 S. Ct. at 1567. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S. Ct. at 1566.

In this case, our confidence in the jury's verdict is not undermined by evidence that the defendant was not the only cellmate about whom Riggan had "snitched." There was no evidence at trial that Riggan was paid for the information that he supplied or that he benefitted in some other way. Moreover, no proof suggested that the detectives intentionally "planted" Riggan in the same cell as the defendant to obtain evidence. The state's theory of the case was that the defendant and Reese were co-conspirators, jointly involved in the beating death and robbery of the victim. Reese had pleaded guilty to the charged crimes for which she received a life sentence. The jurors very likely and reasonably gave substantial weight to Reese's testimony which placed the defendant at the murder scene and which identified the defendant as the person who had wielded the lethal claw hammer. Faced with Reese's powerful testimony, the defendant crafted a theory of defense (without testifying or presenting other evidence) that it was Reese who struck and killed the victim. We fail to see how the battle lines thus drawn would have changed had the defense been able to impeach Riggan's motive for testifying, nor does the defendant enlighten us how exposing Riggan as a

-13-

jailhouse snitch would have "put the whole case in such a different light" as to rattle our confidence in the outcome of the trial.

Accordingly, the defendant has not satisfied his burden of demonstrating the materiality of the information that was withheld, and we hold that no due process violation has been established.

## V.  Sentencing

The defendant's final complaint is that the trial court improperly ordered consecutive sentencing.  On the defendant's especially aggravated robbery conviction, the trial court imposed a 25-year sentence at 100 percent.  That sentence was ordered to run concurrently to the eleven-year sentence at 30 percent for the conspiracy conviction.  Both sentences were then ordered to be served consecutively to defendant's first-degree murder sentence of life without parole.  The defendant contends that the evidence is insufficient to show that he is a professional criminal with no visible means of support other than his criminal conduct.  The defendant also claims that consecutive sentencing is unnecessary to protect the public because he already has been sentenced to life without the possibility of parole.

When there is a challenge to the length, range, or manner of service of a judicially imposed sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-401(d) (1997).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see State v. Hooper,* 29 S.W.3d 1, 5 (Tenn. 2000).  "The burden of showing that the sentence is improper is upon the appellant." *Ashby*, 823 S.W.2d at 169.  In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*.  *Id.*  If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result."  *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Before consecutive sentencing can be ordered, the trial court must first determine that one or more of the statutorily enumerated criteria of Code section 40-35-115 exist and find that the aggregate sentence is reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity of the offender, if the defendant is found to be a dangerous offender. *State v. Wilkerson*, 905 S.W.2d 933, 937 (Tenn. 1995). *See also State v. Lane*, 3 S.W.3d 456 (Tenn. 1999) (holding *Wilkerson* factors are limited to sentencing of "dangerous offenders"). Notwithstanding proof of these criteria, a sentencing court retains the discretion of imposing consecutive sentences. On appeal, the decision that flows from the trial court's discretion is assigned great weight, provided the court correctly applied the principles of consecutive sentencing. Moreover, in determining whether the trial court providently exercised its discretion, the fairness of the resulting sentence under all the circumstances must be ensured.

There are seven statutory criteria in Code section 40-35-115 for imposition of consecutive sentencing.  They are:

(1)   The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2)  The defendant is an offender whose record of criminal activity is extensive;

(3)   The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;

(4)  The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)  The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;

(6)  The defendant is sentenced for an offense committed while on probation; or

(7)  The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7) (1997).

Here, the trial court found that the defendant qualified for consecutive sentencing on grounds (1) and (4).  As for the defendant being a professional criminal who relied on criminal activity as a major source of livelihood, the trial court observed that there was no evidence that the defendant had "any ability to sustain [himself] except through that of criminal activity," or that the defendant had any "visible means of support except that of his actions in taking advantage of the decedent."   The defendant directs us to the employment information section of his presentence report  and points out that Reese was supporting the defendant and herself by working at Hardee's.

According to the presentence report, the defendant was 53 years old at the time of sentencing.  The defendant served in the United States Navy in the mid 1960s, but he was court martialed and received a bad conduct discharge for being away without official leave ("AWOL") for one year or more.  The defendant told the presentence investigator that he had at some unspecified time and place worked "for a carnival."  The defendant also claimed to have worked for a year at G.B. Boot Smith in Mississippi, to have hauled scrap iron, and to have been employed by Wendy's for a short time.  The presentence investigator was unable to confirm any of this employment information and was unable even to locate the area in Mississippi where the defendant said he had worked.  "It would appear," the presentence investigator wrote, "that the defendant is a transient

moving from place to place and is never employed for any period of time." The trial court obviously agreed with that assessment, and we concur.

The record of the defendant's criminal activity is somewhat sketchy, but evidently he has one or more Illinois convictions. Moreover, at the time of sentencing arson charges had been filed and were pending against him in Rutherford County. We note that the defendant listed no financial assets or outstanding debts, other than court costs from this prosecution. By all indications, his livelihood was tied intimately to his criminal endeavors, but we "need not spend time and lineage" further analyzing this factor. *See State v. Bernard K. Johnson*, No. E2000-00009-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Knoxville, Jan. 31, 2001). "Only one factor need be proven to support a consecutive sentence." *State v. Ernest Leon Powers, Jr.*, No. 03C01-9606-CC-00222, slip op. at 18 (Tenn.Crim.App., Knoxville, Oct. 28, 1997). In this case, the record fully supports the application of factor (4) that the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."

The trial court made the required specific findings that an extended sentence is necessary to protect society and is reasonably related to the severity of the offenses relative to consecutive sentencing under the "dangerous offender" category in Code section 40-35-115(b)(4). *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The only finding that the defendant challenges on appeal is whether consecutive sentencing is necessary to protect the public.

The defendant posits that consecutive sentencing is superfluous inasmuch as his life without the possibility of parole sentence guarantees that he will never be released from confinement. This argument has been expressly, as well as implicitly, rejected. *State v. Howell*, 34 S.W.3d 484 (Tenn. Crim. App.) (consecutive sentencing of life without the possibility of parole for first-degree murders and 25 years for attempted murder affirmed for five of the six defendants), *perm. app. denied* (Tenn. 2000); *State v. Blocker*, No. 03C01-9803-CR-00120 (Tenn. Crim. App., Knoxville, Mar. 10, 1999) (approving consecutive sentencing for felony murder and aggravated robbery convictions; noting cases wherein supreme court had denied permission to appeal when an additional sentence ordered to be served consecutively to sentence of life without parole), *perm. app. denied* (Tenn. 1999); *State v. Christa Gail Pike*, No. 03C01-9611-CR-00408 (Tenn. Crim. App., Knoxville, Nov. 26, 1997) (no abuse of discretion for death sentence and 25-year sentence for conspiracy to commit first-degree murder to be served consecutively ), *aff'd*, 978 S.W.2d 904 (Tenn. 1998).

Accordingly, our review persuades us that the trial court considered and applied the appropriate sentencing principles and did not abuse its discretion in ordering consecutive sentencing in this case. The trial court's sentencing of the defendant is, therefore, affirmed.

In conclusion, we affirm the judgements of guilt in this case and the trial court's sentencing.

_____

JAMES CURWOOD WITT, JR., JUDGE

-16-